**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**JUAN CANDELARIA,**

                         **Plaintiff,**                **00-CV-0912A(Sr)**

**v.**

**R. BAKER, et al.,**

                         **Defendants.**

_____


## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. Richard J. Arcara,
pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon
dispositive motions.[1]  Dkt. #122.


Plaintiff filed this *pro se* action on or about October 24, 2000, seeking
relief pursuant to 42 U.S.C. § 1983.  Dkt. #1.  Thereafter, plaintiff filed numerous
amended complaints (Dkt. ##3, 10 and 11).  In the remaining allegations set forth in the
"third" Amended Complaint (titled Second Amended Complaint) (Dkt. #11) (hereinafter
referred to as "Third Amended Complaint"), the plaintiff alleges that while an inmate at
the Elmira Correctional Facility ("Elmira"), his rights pursuant to the First, Eighth, and
Fourteenth Amendments to the United States Constitution were violated.  *Id*.  Currently
before the Court are the following motions, defendants Floyd G. Bennett, Jr., R. Baker,

_____

[1] This case was originally assigned to United States District Judge John T. Elfvin.
By Order dated October 16, 2007, this case was re-assigned to United States District
Judge Richard J. Arcara.  Dkt. #121.

J. Perry, Lane E. Eck, New York State Department of Correctional Services ("DOCS"), C. Pinker, and Nancy O'Connor's motion for summary judgment (Dkt. #102) and defendants, Arnot Ogden Medical Center ("Arnot"), Kathy Crippen and Timothy Doty's motion for summary judgment (Dkt. #114). For the following reasons, it is recommended that both motions for summary judgment (Dkt. ##102 and 114) be granted and the Third Amended Complaint be dismissed in its entirety.

## BACKGROUND

### Procedural History

Plaintiff, proceeding *pro se*, commenced this action on or about October 24, 2000. Dkt. #1. On January 29, 2001, plaintiff filed an amended complaint as of right. Dkt. #3. By Decision and Order dated April 5, 2001, United States District Judge William M. Skretny dismissed several of plaintiff's claims, found some of plaintiff's claims to be sufficient as pled and further found that other claims would be dismissed unless plaintiff filed a Second Amended Complaint. Dkt. #5. On April 23, 2001, plaintiff filed a Second Amended Complaint (Dkt. #10) and a Third Amended Complaint (Dkt. #11). In a Decision and Order dated August 15, 2001, United States District Judge Skretny ordered that the Second Amended Complaint (Dkt. #10) be transferred to the United States District Court for the Southern District of New York. Dkt. #12. Judge Skretny further ordered, *inter alia*, that: claims E, G, and H in the Third Amended Complaint (Dkt. #11) be dismissed with prejudice; claim F in the Third Amended Complaint (Dkt. #11) be dismissed without prejudice; and paragraphs 6, 11, 13, 18, 21,

36-84, 87, 96, 98, 99-100, 103, 106-111, and 117-118 of the Third Amended Complaint (Dkt. #11) be stricken.  Dkt. #12.  Accordingly, the following claims remain and are the subject of the pending motions for summary judgment *to wit*: defendants Baker, Perry and Eck retaliated against plaintiff by, *inter alia*, changing his dialysis schedule and writing false misbehavior reports (*see* Dkt. #12, p.4); defendant O'Connor denied plaintiff adequate medical treatment and allowed other defendants to have access to plaintiff's medical file (*see* Dkt. #12, p.4); defendant Pinker retaliated against plaintiff by writing a false misbehavior report due to plaintiff's exercise of his religious beliefs (*see* Dkt. #12, p.4); defendant Bennett was repeatedly advised by plaintiff of his complaints concerning staff and as a result of those complaints, plaintiff was subjected to retaliation by other defendants (*see* Dkt. #5, p.3); defendants DOCS and Arnot Ogden Medical Center violated plaintiff's rights under the Americans with Disabilities Act (*see* Dkt. #5, p.15); defendants Crippen and Doty were involved in the changing of plaintiff's dialysis schedule (*see* Dkt. #11, p.12); and, plaintiff has been denied a special diet by reason of his religious beliefs (*see* Dkt. #5, p.3).

**Plaintiff's Medical Conditions**

The plaintiff has been an inmate in DOCS since in or about 1989.  Dkt. #113-4, p.1.  The plaintiff is a paraplegic and is confined to a wheelchair.  Dkt. #11, p.2, ¶ 4.  In or about November 1997, plaintiff became wholly dependent on dialysis.  *Id*. Beginning in December 1997, plaintiff was housed at Elmira in Chemung County, New York.  *Id*.  Dialysis treatment was provided to patients at Elmira at the Dialysis Unit

operated by defendant Arnot Ogden Medical Center ("Arnot"). Dkt. #113-4, p.1. For a period of time, up to June 19, 2000, plaintiff received his dialysis treatments every Tuesday, Thursday and Saturday from "12:30 a.m. [sic] through 4:00 p.m." Dkt. #11, p.11, ¶ 4. As will be discussed in greater detail below, on or about June 19, 2000, plaintiff's dialysis schedule was changed to Monday, Wednesday and Friday from "6:00 a.m. through 12:30 a.m. [sic]." *Id*.

**Retaliation Claims Against Defendants Eck, Baker and Perry**

**Change to Plaintiff's Dialysis Schedule**

In 2000, defendants Lane Eck and Robert Baker were employed by DOCS as corrections officers. Dkt. #110, ¶ 1; Dkt. #107, ¶ 1. At all times relevant to the allegations against defendants Eck and Baker, defendants Eck and Baker were assigned to the Dialysis Unit at Elmira, where plaintiff was a patient, to provide security within the unit. Dkt. #110, ¶ 4; Dkt. #107, ¶ 4. As against defendants Eck and Baker, plaintiff alleges, in part,

> On June 6, 2000, Plaintiff submitted a three-pages [sic] letter with [sic] Defendants Bennett and Doty complaining about specific unconstitutional/unprofessional acts and omissions of Defendants Crippen, Eck, and Baker, in connection with their unconstitutional treatment of plaintiff (see e.g. Exhibit A1 through A6) ("the First Letter").
>
> Consequently, on June 17, 2000, Defendants Baker and Eck approached plaintiff, and Baker informed plaintiff that, effective Monday, June 19, 2000, Plaintiff's dialysis treatment schedule would be changed from Tuesdays, Thursdays, and Saturdays [sic] afternoon (12:30 a.m. [sic] through 4:00 p.m.), to Mondays, Wednesdays, and Friday morning (6:00 a.m. through 12:30 a.m. [sic]) , upon

information and belief, in retaliation for, among other things,
the submission of the First Letter.

Dkt. #11, p.11, ¶¶ 3-4.  Plaintiff further claims that the change to his dialysis schedule,

alleged to have been undertaken by defendants Eck and Baker, was accomplished with

the knowledge of defendants Crippen, Bennett and Doty.  In support of their motion for

summary judgment, defendants Eck and Baker each state in their respective affidavits

that,

[w]hile plaintiff's dialysis schedule was changed from
afternoon to mornings sometime in July of 2000, I did not
change the schedule.  As a corrections officer, I did not have
the authority to do so.  Rather, my only role as a corrections
officer would be to notify the inmate of the change.

Dkt. #110, ¶ 5; Dkt. #107, ¶ 5.  Defendants submit that during his deposition, plaintiff

admitted that the only reason he believed that defendants Eck and Baker changed his

dialysis schedule was the timing of the change and the fact that they notified him of the

change.  Dkt. #105-2, pp.3-4.  Indeed, plaintiff further admitted during his deposition

that he did not know who actually changed the schedule.  *Id*.  In his Third Amended

Complaint, plaintiff further alleges that in addition to the letters and formal complaints

filed against DOCS employees, plaintiff also commenced a civil rights action here in the

Western District of New York against, *inter alia*, defendants Eck[2] and Baker, *Candelaria

v. New York State Department of Corrections, et al.*, Case No. 00-CR-240.  Indeed, in

the action *Candelaria v. New York State Department of Corrections, et al.*, plaintiff

_____

[2] In his Decision and Order granting defendants' motion for summary judgment in
*Candelaria v. New York State Department of Corrections, et al.*, United States District
Judge John T. Curtin noted that "[d]efendant Eck has not been served, nor has he
appeared."  00-CV-240 Dkt. #83, p.2.

alleged that his "[d]ialysis schedule has been changed in retaliation for Plaintiff's attempts to obtain judicial relief from the violations detailed in this [ ] Complaint." *See* Dkt. #105-3, ¶ 62. In a Decision and Order dated March 20, 2006, United States District Judge John T. Curtin, to whom *the case Candelaria v. New York State Department of Corrections, et al.* was assigned, granted defendants' motion for summary judgment based on plaintiff's failure to exhaust his administrative remedies. As a threshold matter, defendants take the position that by reason of Judge Curtin's Decision and Order in *Candelaria v. New York State Department of Corrections, et al.*, Case No. 00-CV-240, the plaintiff is precluded from re-litigating those same claims/issues herein under the theory of either res judicata or collateral estoppel. Dkt. #103, pp.5-7. In the alternative, defendants assert that plaintiff's claims of retaliation are without merit and that the plaintiff failed to exhaust his administrative remedies.

### False Misbehavior Report

As with defendants Eck and Baker, at all times relevant to plaintiff's allegations, defendant Perry was employed by DOCS. Dkt. #109, ¶ 1. Specifically, defendant Perry was employed as a Sergeant at Elmira. *Id*. As against defendants Eck, Baker and Perry, the plaintiff claims that these defendants and others were involved in a scheme to coerce Nurse Jo Ellen Malinowski, an Arnot employee, into making a complaint about plaintiff which in turn resulted in an Inmate Misbehavior Report. Specifically, plaintiff alleges,

> [a]ccordingly, on July 12, 2000, pursuant to the coerced
> instruction of Defendants Eck, Baker, Crippen, O'Connor,

and with the knowledge of Defendants Bennett and Doty, Ms. Malinowski made the following entry in plaintiff's medical record (Progress Notes):

> At 0930 today [7/12/00] Inmate Juan Candelaria (89T5069) dialysis machine alarmed.  I came over to the machine to see why it was alarming.  The venous isolation was wet and as I was changing the isolation, the pt was asking many questions as to why this occurred.  I was explaining in very short-concise answers why this could have occurred & I assured the pt. it was not unusual, and was not anything to be concerned about.  The pt then stated that he was having many personal difficulties lately.  He then stated no matter what has happened too me - **I am still in love with you**.  The pt continued talking in a very low voice but I could not understand what he said.  Then in a little louder voice [,] he said I would advise you not to say anything to anybody about what I say to you.  I could not just walk away from the pt. at this point as I was still changing solution, and resetting the machine.  Juan then proceeded to say he had 1 [sic] had a dream about me & that officer.  He asked me what is that officer's name.  I did not reply.  Then Juan said [sic] was it true-or was it just a dream.  Then the pt started asking me how I received bruises on my arm.  He made a few comments suggesting that he though [sic] someone had been abusive to me, & told me he was concerned because **he cares about me**.  I walked away from the pt at this point as the solution was changed & blood flow resumed.  I reported this incident to C.O. Eck immediately.  Timothy Doty RN was notified, as well as Nancy O'Connor RN (ECF RN Administrator).

Entry of July 12, 2000 made by RN Jo Ellen Malinowski in Plaintiff's Medical chart (Arnot Ogden Medical Center's Progress Record) copy of which is attached herewith and marked **Exhibit A34**) (emphasis added, internal quotations

omitted, and parenthesis in the original)("the Medical
Record").

Dkt. #11, pp14-15 (emphasis in original).  Plaintiff further alleges that without his

authorization defendants Eck and Baker accessed plaintiff's medical records with

defendant Crippen's permission and with the knowledge of defendants O'Connor,

Bennett and Doty, and thereafter, shared the information in plaintiff's medical records

concerning the above incident with defendant Perry.  As alleged in the Third Amended

Complaint, defendant Perry, using the information allegedly obtained by defendants

Eck and Baker from plaintiff's medical records,

> using as a pretext the Medical Record, fabricated a Tier III-
> baseless "Inmate Misbehavior Report" against plaintiff
> falsely accusing him of violating specifically claimed rules of
> the prison prohibiting inmates conduct and, on the basic [sic]
> of that unfounded baseless disciplinary accusations, Plaintiff
> was sanctioned with 60 days of keeplock confinement, 60
> [sic] loss of available privileges, and was required to pay five
> dollars in mandatory disciplinary surcharges.

Dkt. #11, p.16.


In support of their motion for summary judgment, defendants Perry,

Baker, Eck and O'Connor each offer an explanation of what transpired between plaintiff

and Nurse Malinowski and the disciplinary charges that followed.  *See* Dkt. ##110, 107,

109 and 111.  Defendant Eck states in his affidavit that on July 12, 2000, Nurse

Malinowski consulted him about remarks plaintiff had made.  Specifically, Nurse

Malinowski told defendant Eck that plaintiff had told her he was in love with her and did

not want another officer talking with her and that she should not say anything about the

incident and that he was having dreams about her.  Dkt. #110, ¶ 6.  Thereafter,

defendant Eck advised Nurse Malinowski to report the matter to her supervisor. *Id*.

Defendant Eck memorialized his involvement in this incident in two memoranda dated

July 14, 2000 and July 17, 2000. *See* Dkt. #110, pp.3-5. Finally, defendant Eck states

that at no time did he ever open or review plaintiff's medical records and in fact, he had

not seen Nurse Malinowski's report until after the instant action was commenced. *Id*. at

¶¶ 7-8.

In his affidavit in support of defendants' motion for summary judgment,

defendant Baker describes a separate incident involving plaintiff and Nurse Malinowski

that took place on or about February 3, 2000. *See* Dkt. #107. Specifically, with respect

to the February 3, 2000 incident, defendant Baker states,

> on February 3, 2000, I wrote a memorandum to my
> supervisor, Sgt. Pieri concerning inmate Candelaria's
> inappropriate behavior with Nurse Jo Ellen Malinowski. ... In
> the report, I advised Sgt. Pieri that plaintiff was making
> personal and inappropriate remarks to the nurse. Ms.
> Malinowski advised me that she was upset about the matter
> and was uncomfortable around the plaintiff.

Dkt. #107, ¶ 7. Finally, with respect to plaintiff's allegations that defendant Baker

accessed plaintiff's medical records, defendant Baker states, "at no time did I ever open

or review plaintiff's medical records for any reason. Nor did I have access to the

records." Dkt. #107, ¶ 10.

There is no dispute that defendant Perry prepared an Inmate Misbehavior

Report in or about July 2000, charging plaintiff with disorderly conduct 104.13,

harassment 107.14, and threats 102.10. Dkt. #109, p.5. As reflected in the Inmate

Misbehavior Report, the allegations in the report are based on a five month

investigation conducted by defendant Perry. *Id*. Moreover, defendant Perry recounts in

his affidavit that his investigation included interviews of Nurse Malinowski and others.

Dkt. #109, ¶¶ 6-7. Specifically, defendant Perry states,

> [a]t no time were my actions taken in retaliation for any
> complaint or grievance made by plaintiff. Rather, the report
> was written based on my investigation, including the
> statement of Nurse Malinowski and my interview with her,
> whereby it was readily apparent to me that plaintiff had
> engaged in harassing and threatening behavior while a
> patient in the dialysis unit.

Dkt. #109, ¶ 8. Finally, defendant Perry states that at no time did he review plaintiff's

medical file with respect to Nurse Malinowski's complaint. *Id*. at ¶ 9. Rather, defendant

Perry explains that the sources of the information contained in the Inmate Misbehavior

Report were the interviews that he conducted and information contained in the unit log

book, not plaintiff's medical records. *Id*.


For the period, June 2000 through November 2000, defendant O'Connor

was employed by DOCS as the Nurse Administrator at Elmira. Dkt. #111, ¶ 1.

Defendant O'Connor explains in her affidavit in support of her motion for summary

judgment that she was advised on July 12, 2000 by defendant Crippen that plaintiff had

made inappropriate remarks to Nurse Malinowski. Dkt. #111, ¶12. Thereafter,

defendant O'Connor approached Nurse Malinowski and Nurse Malinowski explained

what had transpired with the plaintiff and documented the incident and provided a copy

of her report to defendant O'Connor and defendant Doty. *Id*. Indeed, a copy of Nurse

Malinowski's handwritten report reflects that copies were provided to defendants O'Connor and Doty.  Dkt. #111, pp.23-24.

## Plaintiff's Claims Against Defendant O'Connor

In addition to the foregoing, plaintiff claims that defendant O'Connor failed to provide him with appropriate medical care following his dialysis treatments in violation of the Eighth Amendment.  Dkt. #11, pp.20-24.  Plaintiff further claims that defendant O'Connor participated in the coercion of Nurse Malinowski described above and knew that defendants Eck and Baker accessed plaintiff's medical records.  Dkt. #11, pp.15-16.  Plaintiff initially complains that following his morning dialysis treatments, he and other dialysis patients were required to remain in a holding cell or "bullpen" adjacent to the Dialysis Unit until the facility completed its count of all the inmates at approximately 12:30 p.m.  Dkt. #11, pp.21-22.  Plaintiff alleges that following his dialysis, he would, on occasion, feel ill and rather than being permitted to return to his cell, he was required to remain in the holding cell without any medical treatment or security supervision.  *Id*. Plaintiff further alleges that,

> [i]n response to plaintiff's complaint about the defendants' unreasonable policy and practice of hold [sic] the dialysis patients there in the prison bullpen long after they have received their dialysis treatment, Defendant Nancy O'Connor issued an order on or about June 5, 2000 directing that plaintiff, and only plaintiff, be isolated in the prison infirmary while the other dialysis patients would remain in the bullpen pending clearance of the count.

Dkt. #11, p.23.

In her affidavit submitted in support of her motion for summary judgment, defendant O'Connor details a specific incident wherein on or about June 30, 2000, after completing his dialysis treatment, plaintiff complained that he felt lightheaded and collapsed on the waiting room floor. Dkt. #111, ¶ 6. Immediately thereafter, plaintiff was examined by a Physician's Assistant and plaintiff was instructed that if the lightheadedness did not improve to follow-up at sick call. *Id*. at ¶ 7. Notwithstanding the foregoing, when she learned of the incident, defendant O'Connor instructed the nurses and security personnel that after his dialysis treatments, including the June 30, 2000 treatment, plaintiff was to be sent to the infirmary for approximately one hour for observation to ensure that the incident would not happen again. Dkt. #111, ¶ 8 and p.11. As explained by defendant O'Connor, her instruction to send plaintiff to the infirmary for observation, "was done by me to protect the plaintiff and to allow him to be close to the medical staff in the event treatment was needed." Dkt. #111, ¶ 8. Thus, defendant O'Connor argues that her actions were taken "to assure that plaintiff's health and safety was protected." *Id*. at ¶ 10.

Plaintiff also alleges that defendant O'Connor participated in the coercion of Nurse Malinowski which, according to plaintiff, forced Nurse Malinowski to fabricate a complaint against plaintiff. Dkt. #11, pp.15-16. In addition, plaintiff further complains that defendant O'Connor knew that defendants Eck and Baker had been given access to plaintiff's medical records. *Id*. In her affidavit submitted in support of her motion for summary judgment, defendant O'Connor states,

> [o]n or about July 12, 2000, when I was making a round,
> Nurse Crippen informed me that plaintiff had made some
> inappropriate remarks to Nurse Jo Ellen Malinowski, and she
> was upset. I approached Ms. Malinowski, and she informed
> me that plaintiff told her he cared about her and loved her.
> Plaintiff whispered these remarks to her and then told her
> not to tell anyone. Because I felt this was an obvious ploy
> on the part of the plaintiff to isolate Ms. Malinowski from the
> other employees, I immediately informed security staff of
> what had happened. In addition, Ms. Malinowski wrote a
> note complaining of the incident on July 12, 2000 and
> provided [sic] a copy of [sic] me and her supervisor Tim
> Doty, RN.

Dkt. #111, ¶ 12 and p.23. Finally, defendant O'Connor states that at no time was Nurse

Malinowski coerced or threatened by her or by anyone else in her presence. Dkt. #111,

¶ 13. Moreover, defendant O'Connor states that at no time did she allow any security

staff access to plaintiff's medical records. Dkt. #111, ¶ 14. Indeed, defendant

O'Connor explains that the plaintiff's dialysis treatment records are the property of Arnot

and were kept in a locked filing cabinet and that because she was not an employee of

Arnot, she did not have a key to the filing cabinet. *Id*.


**Retaliation Claim Against Defendant Pinker**

Plaintiff alleges that defendant Pinker wrote a false misbehavior report in

retaliation for plaintiff exercising his religious beliefs. Dkt. #11, pp.16-20. In the Third

Amended Complaint and later in his deposition, plaintiff claims that he made a

commitment to "God and all the saints" to keep his hair in a certain style. Dkt. #11,

pp.16-20; Dkt. #105-2, pp.6-10. As alleged in the Third Amended Complaint, on

October 19, 2000, plaintiff was eating in the prison dining hall when defendant Pinker

approached plaintiff and directed plaintiff to cut all of his hair immediately. Dkt. #11,

p.19.  In response, plaintiff endeavored to explain to defendant Pinker that his hair style was in fulfillment of a vow he had made to "God and all the saints."  Dkt. #11, pp.16-20; Dkt. #105-2, pp.6-10.   Plaintiff further alleges that after he refused to cut his hair because it was in compliance with DOCS' directives, defendant Pinker placed plaintiff in "keeplock confinement where plaintiff remained fifteen days until the charges were dismissed upon appeal."  Dkt. #11, p.19.

In support of his motion for summary judgment, defendant Pinker states that on October 19, 2000, he observed plaintiff with a "Mohawk style haircut."  Dkt. #108, ¶ 4.  It was defendant Pinker's belief that plaintiff's Mohawk style haircut violated Directive 4914 Inmate Grooming Standards because only basic haircuts are allowed. *Id*.  As alleged in his complaint, plaintiff claims to have "adopted a standard hair cut style of approximately hair length of ¼ of inch long in the back of his neck, in the left side and in the right side, and ½ of inch on the top of his head."  Dkt. #11, p.19. Thereafter, defendant Pinker ordered the plaintiff to the barbershop during the next call out to get a hair cut and when plaintiff refused, defendant Pinker wrote an Inmate Misbehavior Report for failing to comply with a direct order and failing to comply with staff direction.  Dkt. #108, ¶ 4.  Plaintiff was later advised that due to a "technical question raised concerning the location of the incident," the disposition of the Tier II Hearing was reversed.  Dkt. #108, ¶ 5 and p.8.  However, plaintiff was reminded that absent a religious exemption, he is required to remain in compliance with DOCS Directive 4914 concerning his hairstyle.  Dkt. #108, p.8.  In his affidavit, defendant

Pinker offered the following explanation for the "technical question" which precipitated the reversal,

> [a]s shown on [sic] misbehavior report, I noted that the place of the incident was the Barbershop. In reality, it was plaintiff's refusal to go to the barbershop as ordered that resulted in me writing the misbehavior report. Plaintiff did not refuse to comply with the direct order in the Barbershop.

Dkt. #108, ¶ 5.


**Plaintiff's Claims Against Defendant Bennett**

Prior to his retirement in October 2002, defendant Floyd Bennett was the Superintendent at Elmira. Dkt. #112, ¶ 1. Plaintiff claims that defendant Bennett had actual and constructive knowledge of the alleged staff misconduct, including retaliation and deliberate indifference to plaintiff's serious medical needs, and that despite this knowledge, defendant Bennett did nothing to remedy the situation. Dkt. #11, p.5, ¶ 12. In his affidavit submitted in support of his motion for summary judgment, defendant Bennett recites each complaint he received from plaintiff during the time period alleged in the Third Amended Complaint and explains what measures were taken to address each complaint. For each complaint, defendant Bennett explained that the matter was referred to a subordinate for handling. Dkt. #112, ¶ 5.

Specifically, on or about June 27, 2000, plaintiff wrote a lengthy "report" outlining what he described as professional misconduct occurring in the dialysis unit. Dkt. #112, pp.12-30. The matters detailed in plaintiff's "report" were referred to First

Deputy Superintendent Dana Smith[3] for investigation. Dkt. #112, ¶ 6. In memoranda dated July 5, 2000 and July 17, 2000, First Deputy Superintendent Smith responded to plaintiff's allegations and outlined the findings of the investigations which concluded that plaintiff's allegations were without merit. Dkt. #12, ¶ 7 and pp.5-6.

On or about August 18, 2000, defendant Bennett received a letter from plaintiff enumerating seventeen (17) complaints/allegations. Dkt. #112, pp.37-40. The matter was again referred to First Deputy Superintendent Smith for investigation and response. After a full investigation, including conducting interviews and reviewing reports, First Deputy Superintendent Smith responded to plaintiff's August 18, 2000 letter on September 1, 2000 and found that plaintiff's allegations were without merit. Dkt. #112, ¶ 8 and p.32. On or about October 31, 2000, plaintiff submitted a lengthy hand-written letter detailing the incident involving defendant Pinker (discussed above). The matter was referred to Captain Colvin and as detailed above, due to a "technical question raised concerning the location of the incident," the disposition of the Tier II Disciplinary Hearing was reversed. Dkt. #108, ¶ 5 and p.8.

On January 2, 2001, plaintiff submitted a two-page complaint concerning an alleged denial of access to certain programs because his dialysis schedule had been changed. Dkt. #112, ¶ 10 and pp.60-61. This complaint was again referred to

---

[3] Dana Smith was originally named as a defendant in the instant case. United States District Judge Skretny's Decision and Order dated August 15, 2001 (Dkt. #12) dismissed plaintiff's claims against Dana Smith with prejudice and Dana Smith was thereafter terminated as a party to this action.

First Deputy Superintendent Smith for investigation and response.  Dkt. #112, ¶ 10.  In

a memorandum dated January 3, 2001, First Deputy Superintendent Smith found

plaintiff's allegations of discrimination based on disability to be without merit and further

directed the Program Committee Chairperson to review with plaintiff his program status

to find appropriate afternoon programming.  Dkt. #112, ¶ 10 and p.59.  Finally,

defendant Bennett states in his affidavit in support of his motion for summary judgment

that plaintiff claims to have submitted a complaint to his office on June 6, 2000,

however, there is no record of his office receiving the complaint.  Dkt. #112, ¶ 11.


**<u>Denial of Special Renal Diet</u>**

In addition to plaintiff's claim that his hairstyle was in fulfillment of a vow

he had made to "God and all the saints," plaintiff alleges that fulfillment of his vow also

required him to fast.  Dkt. #11, pp.18-20.  As a dialysis patient, plaintiff was prescribed

a special renal diet.  *Id*.  Plaintiff alleges, however, that defendants Bennett, Crippen,

Doty, Arnot and DOCS have refused to provide him with the prescribed special renal

diet because plaintiff's fasting causes him to miss too many meals, rendering the

prescribed diet ineffective.  *Id*.  In other words, plaintiff states,

> [a]ccording to the Defendant, plaintiff must discontinue
> fulfillment of the vow by stopping his fasting practice in order
> to receive his medically needy [sic] and prescribed special
> diet or he may continue fulfilling the vow by continuing his
> fasting practice without receiving the above mentioned
> medically needy [sic] and prescribed special diet which
> consists of lower sodium, lower potassium, high protein, and
> very lower [sic] fluids, as well as lower phosphorus.

Dkt. #11, p.18.

Defendants argue that the claim that plaintiff has been denied a renal diet because of his religious beliefs has been litigated on two separate occasions, here in the Western District of New York in *Candelaria v. New York State Department of Corrections et. al.*, Case No. 00-CV-240 (Curtin, J.) and in the Southern District of New York in *Candelaria v. Cunningham, et al.*, Case No. 99-CV-6273 (Preska, J.). In support of the instant motion for summary judgment with respect to plaintiff's claim of denial of a renal diet, defendants principally rely on the transcript of an evidentiary hearing held before United States District Judge Preska on February 14, 2000. Dkt. #105-5[4]. The evidentiary hearing was held in connection with plaintiff's motion for a preliminary injunction, wherein plaintiff alleged, *inter alia*, that his religious beliefs required him to fast and as a result he was unable to comply with DOCS' policy requiring mandatory meal attendance. *Id*. at ¶ 8. In denying plaintiff's motion for a preliminary injunction, Judge Preska found that plaintiff's beliefs did not require such a diet and Judge Preska further found that DOCS' policy accommodated plaintiff's beliefs. *Id*. Specifically, Judge Preska held that,

> [w]ith respect to the plaintiff's claim that he wishes to fast one day a week in accordance with his religious belief, I find that he has not established that claim. Specifically, I do not credit his testimony that diet is against his religious belief. In any event, even if I did, I note that the policy is sufficient to accommodate that belief because it permits three meals a

---

[4] In support of the instant motion for summary judgment, defendants' have submitted the affidavit of the Assistant Attorney General together with the exhibit annexed thereto filed in opposition to plaintiff's motion for a preliminary injunction in *Candelaria v. New York State Department of Corrections, et. al.*, 00-CV-240. The exhibit attached to the Affidavit of Assistant Attorney General Stephen F. Gawlick (filed in Case No. 00-CV-240) was the transcript of the preliminary injunction hearing held before United States District Judge Preska on February 14, 2000.

week, that is all in one day, to be missed before an inmate will receive a disciplinary ticket for missing his meals on a special diet.

In addition I credit the testimony of Mr. Lute that he is particularly lenient with respect to renal patients and their lethargic feelings following dialysis. Accordingly, plaintiff's request for preliminary injunction is denied.

Dkt. #105-5, pp.218-219.


Thereafter, in *Candelaria v. New York State Department of Corrections, et. al.*, plaintiff sought a preliminary injunction claiming that he was being denied a renal diet due to his religious beliefs. Dkt. #105-5. In denying plaintiff's motion for a preliminary injunction, United States District Judge John T. Curtin reasoned,

[t]he papers reveal that plaintiff has been offered and given the opportunity to receive a renal diet. However, before the renal diet is supplied to plaintiff, he must sign a promise to go to the mess hall and pick up his food there at certain prescribed times. Plaintiff refuses to do so, saying that because of certain religious beliefs he must fast during certain times of the week and therefore will not be able to eat the food presented to him. Defendants' requirement that an inmate on a renal diet must go to the mess hall to pick up his meal is a reasonable one. As Judge Preska noted in a prior action brought by the plaintiff, this requirement gives the medical staff the opportunity to monitor the plaintiff's compliance with the prescribed diet. In addition, this policy is cost effective since it reduces the amount of food and labor that is wasted when specially prepared meals are not claimed. Defendants' position is that if plaintiff desires to fast at certain times, then that is his option. However, in order to receive the renal diet, plaintiff must comply with the regulations. The court finds that there is no support to plaintiff's argument that he has not been provided with a proper diet.

Case No. 00-CV-240, Dkt. #56, p.2.

Here, defendants rely on both Judge Preska's and Judge Curtin's reasoning and argue that the defendants' actions complied with DOCS' policy and did not significantly interfere with plaintiff's First Amendment rights. As explained by defendants, in order to receive the renal diet, all plaintiff had to do was go to the mess hall to pick up his meals. Dkt. #103, p.30. Moreover, the policy itself permitted plaintiff to miss three meals per week. *Id*. Therefore, defendants conclude that even if the policy infringed on plaintiff's First Amendment rights, DOCS' policy served a legitimate penological interest. *Id*.

**Plaintiff's Claims Pursuant to the Americans with**
**Disabilities Act and the Rehabilitation Act of 1973**

Plaintiff alleges that the acts of all the defendants have violated the Americans with Disabilities Act and the Rehabilitation Act of 1973, stating, without elaboration that "[t]he acts and omissions of the defendants, each of them, as described heretofore, discriminate against plaintiff on account of his handicaps and physical disabilities..." Dkt. #11, p.55. In support of their motion for summary judgment, defendants argue that plaintiff is precluded from re-litigating his claims pursuant to the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("Rehabilitation Act") because in *Candelaria v. New York State Department of Corrections, et. al.*, Judge Curtin granted defendants' motion for summary judgment on these claims. Dkt. #103, p.6; *see also,* 00-CV-240 Dkt. #83. Specifically, Judge Curtin dismissed plaintiff's ADA claim because plaintiff failed to show discriminatory animus or ill will. *Id*. Plaintiff's Rehabilitation Act claim was dismissed based on a finding that

there was no waiver of sovereign immunity by the State of New York for the claims raised in the complaint. *Id*.

In addition to the foregoing, defendants argue that plaintiff's claims against the defendants in their individual capacities pursuant to the ADA and the Rehabilitation Act must be dismissed because neither the ADA nor the Rehabilitation Act provides for individual capacity suits against state officials. Dkt. #103, p.29. Moreover, defendants argue that plaintiff's claims must be dismissed because plaintiff has failed to establish that defendants' actions were motivated by discriminatory animus or ill will toward the plaintiff and plaintiff failed to establish that defendants violated plaintiff's Constitutional rights. Dkt. #103, pp.30-32.

**Plaintiff's Claims Against Defendants Crippen, Doty and Arnot**

Defendants Kathy Crippen and Timothy Doty are employees of Arnot and both worked in the Dialysis Unit. Dkt. #113-4, pp.1-2. In addition, Nurse Jo Ellen Malinowski, who is not named as a defendant, was an employee of Arnot in the Dialysis Unit. *Id*. As detailed in part above, beginning in February 2000 and continuing through July 2000, plaintiff made inappropriate remarks to Nurse Malinowski. Dkt. #113-4, p.2. Indeed, on February 5, 2000, March 7, 2000, June 8, 2000 and July 12, 2000, Nurse Malinowski memorialized some of the statements made to her by plaintiff. *Id*. In addition, Nurse Malinowski reported these incidents to her supervisors at Arnot, as well as to individuals employed by DOCS. *Id*.

In the Third Amended Complaint, plaintiff alleges that defendants Crippen, Doty and Arnot knew of plaintiff's complaints of unconstitutional and unprofessional conduct. Dkt. #11, p.11. Moreover, plaintiff alleges that defendants Crippen and Doty knew of defendant Eck's and defendant Baker's retaliatory treatment, *to wit*, the changing of plaintiff's dialysis treatment schedule. *Id*. at p.12. Finally, plaintiff alleges that defendants Crippen and Doty conspired with the other named defendants to coerce Nurse Malinowski to file complaints about plaintiff, to permit defendants Eck and Baker to have access to plaintiff's medical records and to assist defendant Perry in the fabrication of the Inmate Misbehavior Report. *Id*. at pp.13-16.

## DISCUSSION AND ANALYSIS

### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

**Official Capacity Claims**

Following Judge Skretny's two decisions dismissing certain of plaintiff's claims (Dkt. ##5 and 12), the following defendants remain: Baker; Perry; Eck; DOCS; Pinker; O'Connor; Arnot; Bennett; Crippen; and, Doty. Dkt. #11. As set forth in the Third Amended Complaint, plaintiff has sued all of the defendants in their individual and

official capacities, with the exception of defendants Crippen and Doty. With respect to defendants Crippen and Doty, however, plaintiff has sued them each individually and "in [their] capacity as a willful participant with state official [Crippen]/employee [Doty]." Dkt. #11, pp.6-7. As discussed above, defendants Crippen and Doty are employees of Arnot and are not employed by DOCS. Plaintiff's claims against the above-named, remaining defendants, excluding defendants Crippen and Doty, are asserted pursuant to 42 U.S.C. § 1983. In order to state a claim pursuant to § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New York*, 985 F.2d 94,98 (2d Cir. 1993).

The Eleventh Amendment to the United States Constitution bars federal courts from exercising subject matter jurisdiction over claims against states absent their consent to such a suit or an express statutory waiver of immunity. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89,90-100 (1984). It is well-settled that states are not "persons" under § 1983, and thus, Eleventh Amendment immunity is not abrogated by that statute. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). The Eleventh Amendment bar extends to agencies and officials sued in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Plaintiff's claims against defendants Baker, Perry, Eck, Pinker, O'Connor, and Bennett, in their official

capacities are barred by the Eleventh Amendment and accordingly, it is recommended that those claims be dismissed.

**Personal Involvement**

It is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)*; Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060,1065 (2d Cir. 1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) was informed of the violation and failed to remedy the wrong; (3) created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon*, 58 F.3d at 873, *citing Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

Plaintiff alleges that defendant Bennett had actual and constructive knowledge of the alleged misconduct and despite this knowledge, failed to remedy the situation. Dkt. #11, p.5, ¶ 12. Conversely, defendant Bennett maintains that each and every letter received from plaintiff was forwarded to members of his staff for investigation and handling. Dkt. #112, ¶ 5. In addition, as discussed above, after an

investigation, interviews and reviewing reports, each of plaintiff's allegations were found to be without merit. Thus, even assuming plaintiff is correct that defendant Bennett knew of the violation(s), the record is clear that he (or his office) took the appropriate steps to investigate the matter. Without more, plaintiff's wholly conclusory statements that defendant Bennett was personally involved in the alleged constitutional violations by reason of his role as Superintendent is insufficient to defeat the motion for summary judgment. Thus, absent any evidence in admissible form to support the allegations that defendant Bennett was personally involved in the alleged constitutional violations, it is recommended that defendant Bennett's motion for summary judgment be granted.[5]


**Deliberate Indifference to Serious Medical Needs**
**Claims Against Defendant O'Connor**

In *Estelle v. Gamble*, the United States Supreme Court determined that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" to the United States Constitution. 429 U.S. 97, 104 (1976). To establish an unconstitutional denial of medical care that rises to the level of an Eighth Amendment violation, a plaintiff (prisoner) must prove, beyond mere conclusory allegations, that the defendant

---

[5] The Court notes that in addition to defendant Bennett's argument that plaintiff's complaint fails as a matter of law due to lack of personal involvement, defendant Bennett also argues that plaintiff's claims against him are precluded under the doctrines of res judicata and collateral estoppel because Judge Curtin had previously ruled on those claims in *Candelaria v. New York State Department of Corrections, et. al.* Because the Court finds that the claims against defendant Bennett fail for lack of personal involvement, the Court need not address defendant Bennett's res judicata and collateral estoppel arguments.

acted with "deliberate indifference to [his] serious medical needs." *Estelle*, 429 U.S. at

104. More specifically, the prisoner must demonstrate both that the alleged deprivation

is, in objective terms, "sufficiently serious," and that, subjectively, the defendant is

acting with a "sufficiently culpable state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66

(2d Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995). Both the objective and subjective

components must be satisfied in order for a plaintiff to prevail on his claim. *Hathaway

v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).


### Objective Component

Under the objective component, in assessing whether a medical condition

is "sufficiently serious," the Court considers all relevant facts and circumstances,

including whether a reasonable doctor or patient would consider the injury worthy of

treatment; the impact of the ailment upon an individual's daily activities; and, the

severity and persistence of pain. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.

1998). A serious medical condition exists where the failure to treat a prisoner's

condition could result in further significant injury or the unnecessary and wanton

infliction of pain. *Id.* Indeed, the Second Circuit has held that the alleged deprivation

must be "sufficiently serious, in the sense that a condition of urgency, one that may

produce death, degeneration, or extreme pain exists." *Hemmings v. Gorczyk*, 134 F.3d

104, 108 (2d Cir. 1998). "[I]n most cases, the actual medical consequences that flow

from the alleged denial of care will be highly relevant to the question of whether the

denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003).

The types of conditions which have been held to meet the constitutional standard of serious medical need include:  the failure to treat a painful and disfiguring facial keloid,  *Brock v. Wright*, 315 F.3d 158, 160 (2d Cir. 2003); refusal to treat a cavity at risk of "acute infection[ ], debilitating pain and tooth loss" unless prisoner consented to extraction of another diseased tooth, *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000); untreated dental problems that resulted in chronic pain for a period of six months resulting in tooth degeneration, *Chance*, 143 F.3d. at 702; failure to treat a ruptured Achilles tendon which resulted in swelling and pain, *Hemmings*, 134 F.3d at 106-07; confiscation of prescription eyeglasses necessary to correct serious vision problem and subsequent denial of medical treatment resulting in loss of vision in one eye, *Koehl v. Dalsheim*, 85 F.3d 86, 87-88 (2d Cir. 1996); failure to remove broken hip pins from prisoner's hip for over three years despite prisoner's complaint of persistent pain, *Hathaway*, 37 F.3d at 64-65; and, loss of an ear where doctor threw away prisoner's ear and stitched up the stump, *Williams v. Vincent*, 508 F.2d 541, 543 (2d Cir. 1974).

### Subjective Component

The subjective component for the establishment of a claim of deliberate indifference to a serious medical need requires that the plaintiff establish that the

defendant acted with a "sufficiently culpable state of mind" so as to violate the Eighth Amendment's cruel and unusual punishment clause. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hathaway*, 37 F.3d at 66, *quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In *Estelle*, the Supreme Court ruled that deliberate indifference may manifest itself in a doctor's refusal to administer needed treatment, a prison guard's intentional denial or delay in granting an inmate access to medical care, or intentional interference with prescribed treatment. *Estelle*, 429 U.S. at 104-05.

"The subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Hathaway*, 99 F.3d at 553, *citing Farmer v. Brennan*, 511 U.S. 825 (1994); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003), *cert. denied*, 543 U.S. 1093 (2005). The Supreme Court further stated in *Estelle* that, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle*, 429 U.S. at 105-06. Thus, the Supreme Court added,

> [a] complaint that a physician has been negligent in
> diagnosing or treating a medical condition does not state a

> valid claim of medical mistreatment under the Eighth
> Amendment. Medical malpractice does not become a
> constitutional violation merely because the victim is a
> prisoner. In order to state a cognizable claim, a prisoner
> must allege acts or omissions sufficiently harmful to
> evidence deliberate indifference to serious medical needs.

*Id*. at 106; *see also Chance*, 143 F.3d at 703 (stating "[s]o long as the treatment given

is adequate, the fact that a prisoner might prefer a different treatment does not give rise

to an Eighth Amendment violation").

Plaintiff claims that defendant O'Connor failed to provide him with

appropriate medical care following his dialysis treatments in violation of the Eighth

Amendment. Dkt. #11, pp.20-24. Specifically, plaintiff complains that following his

morning dialysis treatments, he and other dialysis patients were required to remain in a

holding cell or "bullpen" adjacent to the Dialysis Unit until the facility completed its count

of all the inmates at approximately 12:30 p.m. Dkt. #11, pp.21-22. Plaintiff further

alleges that following his dialysis treatments, on occasion he would feel ill and rather

than being permitted to return to his cell, he was required to remain in the holding cell

without any medical treatment or security supervision. *Id*. Plaintiff further alleges that,

> [i]n response to plaintiff's complaint about the defendants'
> unreasonable policy and practice of hold [sic] the dialysis
> patient there in the prison bullpen long after they have
> received their dialysis treatment, Defendant Nancy O'Connor
> issued an order on or about June 5, 2000 directing that
> plaintiff, and only plaintiff, be isolated in the prison infirmary
> while the other dialysis patients would remain in the bullpen
> pending clearance of the count.

Dkt. #11, p.23.

In her affidavit submitted in support of her motion for summary judgment, defendant O'Connor details a specific incident wherein on or about June 30, 2000, after completing his dialysis treatment, plaintiff complained that he felt lightheaded and collapsed on the waiting room floor. Dkt. #111, ¶ 6. Immediately thereafter, plaintiff was examined by a Physician's Assistant and plaintiff was instructed that if the lightheadedness did not improve to follow-up at sick call. *Id*. at ¶ 7. Notwithstanding the foregoing, when she learned of the incident, defendant O'Connor instructed the nurses and security personnel that after his dialysis treatments plaintiff is to be sent to the infirmary for approximately one hour for observation to ensure that the incident would not happen again. Dkt. #111, ¶ 8 and p.11. As explained by defendant O'Connor, her instruction to send plaintiff to the infirmary for observation, "was done by me to protect the plaintiff and to allow him to be close to the medical staff in the event treatment was needed." Dkt. #111, ¶ 8. Thus, defendant O'Connor argues that her actions were taken "to assure that plaintiff's health and safety was protected." *Id*. at ¶ 10.

Where, as here, the prisoner has received medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgment. Rather, "[p]rison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates [and] courts have repeatedly held that a prisoner does not have the right to the treatment of his choice." *Ross v. Kelly*, 784 F.Supp. 35, 44-45 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir.1992) (internal citations omitted). Here, as demonstrated above, defendant

O'Connor took affirmative steps to safeguard plaintiff's health and plaintiff is simply disagreeing with her protective measures and such disagreement does not give rise to a deliberate indifference claim. For the foregoing reasons, it is recommended that defendant O'Connor's motion for summary judgment on plaintiff's claim for deliberate indifference to his medical needs be granted.

**Retaliation Claims Against Defendants Baker, Eck, Perry, O'Connor and Pinker**

In support of their motion for judgment as a matter of law on plaintiff's retaliation claims, defendants Baker, Eck, Perry, O'Connor and Pinker each argue that plaintiff cannot satisfy his burden and establish that their actions were the result of a retaliatory motive. Dkt. #103, pp.11-15 and 22-24. In response to defendants' motion, plaintiff summarily states, without elaboration that the following are material issues of fact,

> [w]hether the pattern of retaliatory treatment to which plaintiff was subjected, the denial of proper medical care, access to program, change of dialysis schedule, fabrication of the sexual inuendo [sic] allegation, denial of a diet consistent with plaintiff [sic] religion, faith and belief, the failure by defendants to make reasonable accommodation to reassign plaintiff to his convenient dialysis schedule; the release of plaintiff's medical record and the filing of several inmate misbehavior reports by defendant Baker and Eack [sic] falsely accusing plaintiff of violating prison rules, all in retaliation because plaintiff had filed grievances and formal and informal complaints against defendant ...

Dkt. #119. Plaintiff's conclusory allegations, without more, are insufficient to create a material issue of fact.

> An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally

> protected right, such as the filing of a grievance, states a
> claim under § 1983.  A plaintiff alleging retaliatory
> punishment bears the burden of showing that the conduct at
> issue was constitutionally protected and that the protected
> conduct was a substantial or motivating factor in the prison
> officials' decision to discipline the plaintiff.  The burden then
> shifts to the defendant to show that the plaintiff would have
> received the same punishment even absent the retaliatory
> motivation.  The defendant can meet this burden by
> demonstrating that there is no dispute that the plaintiff
> committed the most serious, if not all, of the prohibited
> conduct charged in the misbehavior report.

*Gayle v. Gonyea,* 313 F.3d 677 (2d Cir. 2002) (internal quotations and citations

omitted).  For the reasons set forth below, plaintiff cannot meet his heavy burden of

establishing retaliatory motive on the part of defendants Baker, Eck, Perry, O'Connor

and Pinker.


**Change to Dialysis Schedule - Defendants Baker and Eck**

Here, plaintiff alleges that defendants Baker and Eck, with the knowledge

of defendants Crippen, Bennet and Doty, changed his dialysis schedule in retaliation for

a June 6, 2000 letter/complaint plaintiff filed alleging unconstitutional and

unprofessional acts and omissions by defendants Crippen, Eck and Baker.  Dkt. #11,

p.11, ¶¶ 3-4.  In addition to the letters and formal complaints filed against DOCS

employees, plaintiff also commenced a civil rights action against, *inter alia*, defendants

Eck and Baker, *Candelaria v. New York State Department of Corrections, et al.*, Case

No. 00-CR-240.  Indeed, in the action *Candelaria v. New York State Department of

Corrections, et al.*, plaintiff alleged that his "[d]ialysis schedule has been changed in

retaliation for Plaintiff's attempts to obtain judicial relief from the violations detailed in this Second Amended Complaint." *See* Dkt. #105-3, ¶ 62. There is no dispute that plaintiff's dialysis schedule was indeed changed, however, in support of their motion for summary judgment defendants Baker and Eck each state that neither had the authority to change the schedule, rather, as Corrections Officers, they were merely responsible for notifying the inmate of such a change. Dkt. #110, ¶ 5; Dkt. #107, ¶ 5. Moreover, in his deposition, plaintiff admitted that he did not know who actually changed his dialysis schedule and further, that the only reason he believed that defendants Eck and Baker had changed the schedule in retaliation for his complaints, was the timing of the change in his dialysis schedule and the fact that defendants Baker and Eck advised him of the change. Dkt. #105-2, p.4. Thus, defendants Baker and Eck assert that plaintiff cannot carry his heavy burden of establishing retaliatory motive and therefore, it is recommended that plaintiff's claims of retaliation against defendants Baker and Eck must fail as a matter of law.

In the alternative, defendants Baker and Eck assert that by reason of the doctrines of res judicata and collateral estoppel, plaintiff is precluded from re-litigating the claim that his dialysis schedule was changed in retaliation for the complaints he raised about the unconstitutional and unprofessional acts and omissions of several of the defendants because that claim was fully addressed by Judge Curtin in *Candelaria v. New York State Department of Corrections, et. al*. As noted above in footnote 2, defendant Eck was never served with a copy of the complaint in *Candelaria v. New York State Department of Corrections, et. al*. and never appeared in the action. Thus,

-34-

the Court declines to apply the doctrines of res judicata and collateral estoppel to the claims against defendant Eck herein.

With respect to the application of the doctrines of res judicata and collateral estoppel to the claims against defendant Baker, although the complaint in *Candelaria v. New York State Department of Corrections, et. al.* does allege, "Plaintiff's dialysis schedule has been changed in retaliation for Plaintiff's attempts to obtain judicial relief from the violations detailed in this Second Amended Complaint," the complaint does not specifically allege that defendant Baker retaliated against plaintiff by changing his dialysis schedule. Accordingly, the Court declines to apply the doctrines of res judicata and collateral estoppel so as to preclude the instant claim of retaliation against defendant Baker. Moreover, a formal decision with respect to the res judicata and collateral estoppel arguments submitted by defendants Baker and Eck is not necessary because, as discussed above, this Court finds that plaintiff cannot sustain his heavy burden to demonstrate a retaliatory motive on the part of defendants Baker and Eck. For the foregoing reasons, it is recommended that defendants' motion for summary judgment with respect to the claim of retaliation against defendants Baker and Eck for the change in plaintiff's dialysis schedule be granted.

## False Misbehavior Report - Defendants Baker, Eck, O'Connor & Perry

As against defendants Eck, Baker, O'Connor and Perry, the plaintiff further claims that these defendants were involved in a scheme to coerce Nurse Jo Ellen Malinowski into making a complaint about plaintiff. Plaintiff further alleges that

defendant O'Connor knew that defendants Eck and Baker had allegedly accessed plaintiff's medical records, without plaintiff's authorization, and thereafter, defendants Eck and Baker shared the information in plaintiff's medical records concerning the above incident with defendant Perry. As alleged in the Third Amended Complaint, defendant Perry, using the information allegedly obtained by defendants Eck and Baker from plaintiff's medical records, fabricated an Inmate Misbehavior Report against plaintiff. Dkt. #11, p.16.

In support of their motion for summary judgment, defendants Eck, Baker, Perry and O'Connor each offer an explanation of what transpired between plaintiff and Nurse Malinowski and the disciplinary charges that followed. Defendant Eck states in his affidavit that on July 12, 2000, Nurse Malinowski consulted him about remarks plaintiff had made. Dkt. #110, ¶ 6. Specifically, Nurse Malinowski told defendant Eck that plaintiff had told her he was in love with her and did not want another officer talking with her and further, that she should not say anything about the incident and that he was having dreams about her. Dkt. #110, ¶ 6. Thereafter, defendant Eck advised Nurse Malinowski to report the matter to her supervisor. *Id*. Defendant Eck memorialized his involvement in this incident in two memoranda dated July 14, 2000 and July 17, 2000. *See* Dkt. #110, pp.3-5. Finally, defendant Eck states that at no time did he ever open or review plaintiff's medical records and in fact, he had not seen Nurse Malinowski's report until after the instant action was commenced. *Id*. at ¶¶ 7-8.

In his affidavit in support of defendants' motion for summary judgment, defendant Baker describes a separate incident involving plaintiff and Nurse Malinowski that took place on or about February 3, 2000. *See* Dkt. #107. Moreover, with respect to plaintiff's allegations that defendant Baker accessed plaintiff's medical records, defendant Baker states, "at no time did I ever open or review plaintiff's medical records for any reason. Nor did I have access to the records." Dkt. #107, ¶ 10.

Defendant O'Connor explains in her affidavit in support of her motion for summary judgment that she was advised on July 12, 2000 by defendant Crippen that plaintiff had made inappropriate remarks to Nurse Malinowski. Dkt. #111, ¶12. Thereafter, defendant O'Connor approached Nurse Malinowski and Nurse Malinowski explained what had transpired with the plaintiff and documented the incident and provided a copy of her report to defendant O'Connor and defendant Doty. *Id*. Indeed, a copy of Nurse Malinowski's handwritten report reflects that copies were provided to defendants O'Connor and Doty. Dkt. #111, pp.23-24.

There is no dispute that defendant Perry prepared an Inmate Misbehavior Report in or about July 2000, charging plaintiff with disorderly conduct 104.13, harassment 107.14, and threats 102.10. Dkt. #109, p.5. As reflected in the Inmate Misbehavior Report, the allegations in the report are based on a five month investigation conducted by defendant Perry. *Id*. Moreover, defendant Perry recounts in his affidavit that he conducted a thorough investigation into the incidents involving

plaintiff and Nurse Malinowski, including interviews of Nurse Malinowski and others.

Dkt. #109, ¶¶ 6-7.  Specifically, defendant Perry states,

> [a]t no time were my actions taken in retaliation for any
> complaint or grievance made by plaintiff.  Rather, the report
> was written based on my investigation, including the
> statement of Nurse Malinowski and my interview with her,
> whereby it was readily apparent to me that plaintiff had
> engaged in harassing and threatening behavior while a
> patient in the dialysis unit.

Dkt. #109, ¶ 8.  Finally, defendant Perry states that at no time did he review plaintiff's

medical file with respect to Nurse Malinowski's complaint.  *Id*. at ¶ 9.  Rather, defendant

Perry explains that the sources of the information contained in the Inmate Misbehavior

Report were the interviews that he conducted and information contained in the unit log

book, not plaintiff's medical records.  *Id*.


As discussed above, plaintiff must demonstrate a retaliatory motive on the

part of the defendants.  Without more, the allegations in the Third Amended Complaint

and plaintiff's opposition to defendants' motion for summary judgment concerning the

coercion of Nurse Malinowski, the fabrication of inappropriate remarks made by plaintiff

to Nurse Malinowski, the access allegedly given to defendant Baker and Eck to

plaintiff's medical records and the ensuing false misbehavior report, are insufficient to

satisfy plaintiff's heavy burden of establishing retaliatory motive on the part of the

defendants.  Accordingly, this Court recommends that defendants' motion for summary

judgment on that portion of plaintiff's retaliation claim concerning the events that

culminated in the false misbehavior report prepared by defendant Perry be granted.

**False Misbehavior Report - Defendant Pinker**

Plaintiff alleges that defendant Pinker wrote a false misbehavior report in retaliation for plaintiff exercising his religious beliefs. Dkt. #11, pp.16-20. In the Third Amended Complaint and later in his deposition, plaintiff claims that he made a commitment to God to keep his hair in a certain style. Dkt. #11, pp.16-20; Dkt. #105-2, pp.6-10. As alleged in the Third Amended Complaint, on October 19, 2000, plaintiff was eating in the prison dining hall when defendant Pinker approached plaintiff and directed plaintiff to cut all of his hair immediately. Dkt. #11, p.19. Plaintiff further alleges that after he refused to cut his hair because it was in compliance with DOCS directives, defendant Pinker placed plaintiff in "keeplock confinement where plaintiff remained fifteen days until the charges were dismissed upon appeal." Dkt. #11, p.19.

In support of his motion for summary judgment, defendant Pinker states that on October 19, 2000, he observed plaintiff with a "Mohawk style haircut." Dkt. #108, ¶ 4. It was defendant Pinker's belief that plaintiff's Mohawk style haircut violated Directive 4914 Inmate Grooming Standards because only basic haircuts are allowed. *Id*. As alleged in plaintiff's complaint, "plaintiff has adopted a standard hair cut style of approximately hair length of ¼ of inch long in the back of his neck, in the left side and in the right side, and ½ of inch on the top of his head." Dkt. #11, p.19. Thereafter, defendant Pinker ordered the plaintiff to the barbershop during the next call out to get a hair cut and when plaintiff refused, defendant Pinker wrote an Inmate Misbehavior Report for failing to comply with a direct order and failing to comply with staff direction. Dkt. #108, ¶ 4. Plaintiff was later advised that due to a "technical question raised

concerning the location of the incident," the disposition of the Tier II Hearing was reversed. Dkt. #108, ¶ 5 and p.8. However, plaintiff was reminded that absent a religious exemption, he is required to remain in compliance with DOCS Directive 4914 concerning his hairstyle. Dkt. #108, p.8. In his affidavit, defendant Pinker offered the following explanation for the "technical question" which precipitated the reversal,

> [a]s shown on [sic] misbehavior report, I noted that the place of the incident was the Barbershop. In reality, it was plaintiff's refusal to go to the barbershop as ordered that resulted in me writing the misbehavior report. Plaintiff did not refuse to comply with the direct order in the Barbershop.

Dkt. #108, ¶ 5.


Once again, as discussed above, in order to succeed on a claim of retaliation, plaintiff bears a heavy burden of demonstrating retaliatory motive on the part of the defendant. Here, with the exception of the allegations in the Third Amended Complaint and the conclusory statements in plaintiff's opposition to the instant motion for summary judgment, plaintiff offers nothing to establish a retaliatory motive on the part of defendant Pinker. In his opposition to the instant motion for summary judgment, plaintiff claims that defendant Pinker wrote the inmate misbehavior report because, according to plaintiff, Pinker subscribes to different religious beliefs than plaintiff. Dkt. #119, p.8. In addition, plaintiff takes issue with defendant Pinker's description of plaintiff's hairstyle stating, in part, "[it] was not 'a Mohawk style haircut,' as Defendant Pinker himself admitted, it was a '¼ inch length in the back of the neck, in the left side, and the right side, and a length of approximately ½ inch on the top of the head,' and it was in compliance with DOCS Directive No. 4914(III)(A)(2)...". *Id*. (internal citations

omitted). Plaintiff's wholly unsupported and speculative conclusion that the only reason defendant Pinker wrote the misbehavior report is because plaintiff and defendant Pinker do not share the same religious beliefs is insufficient to satisfy plaintiff's heavy burden. Indeed, there is nothing in the record before this Court to suggest such a retaliatory motive. Moreover, the fact that the hearing disposition was reversed on a technical question does not in any way support plaintiff's claim of retaliation. Accordingly, as with plaintiff's claims against defendants Baker, Eck, O'Connor and Perry, plaintiff's retaliation claim against defendant Pinker must also fail and it is recommended that defendant Pinker's motion for summary judgment be granted.

## First Amendment Claim - Denial of Special Renal Diet

In addition to plaintiff's claim that his hairstyle was in fulfillment of a vow he had made to "God and all the saints," plaintiff alleges that fulfillment of his vow required him to fast. Dkt. #11, pp.18-20. As a dialysis patient, plaintiff was prescribed a special renal diet. *Id*. Plaintiff alleges, however, that defendants Bennett, Crippen, Doty, Arnot and DOCS have refused to provide him with the prescribed special renal diet because plaintiff's fasting causes him to miss too many meals, rendering the prescribed diet ineffective. *Id*. In other words, plaintiff states,

> [a]ccording to the Defendant, plaintiff must discontinue fulfillment of the vow by stopping his fasting practice in order to receive his medically needy [sic] and prescribed special diet or he may continue fulfilling the vow by continuing his fasting practice without receiving the above mentioned medically needy [sic] and prescribed special diet which consists of lower sodium, lower potassium, high protein, and very lower [sic] fluids, as well as lower phosphorus.

Dkt. #11, p.18.


Defendants assert that the claim that plaintiff has been denied a renal diet because of his religious beliefs has been litigated on two separate occasions, here in the Western District of New York in *Candelaria v. New York State Department of Corrections et. al.*, Case No. 00-CV-240 (Curtin, J.) and in the Southern District of New York in *Candelaria v. Cunningham, et al.*, Case No. 99-CV-6273 (Preska, J.). In support of the instant motion for summary judgment with respect to plaintiff's claim of denial of a renal diet, defendants principally rely on the transcript of an evidentiary hearing held before United States District Judge Preska on February 14, 2000. Dkt. #105-5[6]. As discussed at length above, Judge Preska denied plaintiff's motion for a preliminary injunction finding that plaintiff's beliefs did not require such a diet and in the alternative, Judge Preska further found that DOCS' policy accommodated plaintiff's beliefs. Dkt. #105-5, pp.218-219.


Thereafter, in *Candelaria v. New York State Department of Corrections, et. al.*, plaintiff sought a preliminary injunction claiming that he was being denied a renal diet due to his religious beliefs. Dkt. #105-5. In denying plaintiff's motion for a

---

[6] In support of the instant motion for summary judgment, defendants' have submitted the affidavit of Assistant Attorney General Stephen F. Gawlick together with the exhibit annexed thereto filed in opposition to plaintiff's motion for a preliminary injunction in *Candelaria v. New York State Department of Corrections, et. al.*, 00-CV-240. The exhibit attached to the Affidavit of Assistant Attorney General Gawlick (filed in Case No. 00-CV-240) was the transcript of the preliminary injunction hearing held before United States District Judge Preska on February 14, 2000.

preliminary injunction, United States District Judge John T. Curtin reasoned that defendants' requirement that an inmate on a renal diet must go to the mess hall to pick up his meal is a reasonable one and further that there was no support for plaintiff's assertion that he has not been provided with a proper diet. Case No. 00-CV-240, Dkt. #56, p.2.

Here, defendants rely on both Judge Preska's and Judge Curtin's reasoning and argue that the defendants' actions complied with DOCS' policy and did not significantly interfere with plaintiff's First Amendment rights. As explained by defendants, in order to receive the renal diet, all plaintiff had to do was go to the mess hall to pick up his meals. Dkt. #103, p.30. Moreover, the policy itself permitted plaintiff to miss three meals per week. *Id*. Therefore, defendants conclude that even if the policy infringed on plaintiff's First Amendment rights, DOCS' policy served a legitimate penological interest. *Id*. In his opposition to the instant motion for summary judgment, plaintiff takes the position that the issues raised in *Candelaria v. Cunningham, et al.*, were different from the issues raised here, for example as explained by plaintiff, plaintiff's religion was different and the defendants are different. Dkt. #119, p.8. Moreover, plaintiff claims that the issue presented in *Candelaria v. Cunningham, et al.* was whether the renal diet offered to plaintiff met the components of a renal diet, which, according to plaintiff, Judge Preska found that it did. *Id*. Notably, however, plaintiff makes no effort to distinguish the issues raised herein from those raised in *Candelaria v. New York State Department of Corrections, et. al.*, where, as discussed above,

United States District Judge Curtin denied Candelaria's motion for a preliminary injunction.

Here, as in *Candelaria v. New York State Department of Corrections, et. al.*, the record before this Court reveals that plaintiff has been offered and given a renal diet. However, plaintiff claims that defendants Bennett, Crippen, Doty, Arnot and DOCS have refused to provide him with the prescribed special renal diet because plaintiff's fasting causes him to miss too many meals, rendering the prescribed diet ineffective. *Id*. In support of their motion for summary judgment, defendants rely on the testimony from the evidentiary hearing before Judge Preska with respect to DOCS' policy concerning the renal diet. Specifically, defendants rely on that portion of the testimony requiring prisoners to pick up all meals with the exception of three in one week to assure that the meal is received as a medical prescription, to follow attendance and to prevent the wasting of food. Dkt. #103, p.28. During the hearing before Judge Preska, John Lute, the food service administrator at Elmira and a DOCS employee, testified that the therapeutic diets, including the renal diet, are individually prepared and/or packaged unlike the regular meals that are prepared in bulk. *Id*. As a consequence, the renal diet is more expensive and as a cost saving measure, DOCS implemented an attendance policy which requires prisoners to pick up the therapeutic diet tray to eliminate waste. *Id*. at p.28-29.

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."

*Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir.2003), *citing Pell v. Procunier*, 417 U.S. 817, 822 (1974). However, "[b]alanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.), *cert. denied*, 498 U.S. 951 (1990). As a result, the free exercise claims of prisoners are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588. Accordingly, a regulation that burdens a protected right will pass constitutional muster if it is reasonably related to legitimate penological interests. *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir.2006), *citing O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) and *Turner v. Safley*, 482 U.S. 78, 89 (1987).

It is the inmate's initial burden to demonstrate that the disputed conduct substantially burdens his sincerely held religious beliefs.[7] *Salahuddin*, 467 F.3d at 474-75. In assessing the sincerity of an inmate's religious beliefs, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of

---

[7] In *Ford v. McGinnis*, 352 F.3d 582 (2d Cir. 2003), the Second Circuit noted a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, but declined to resolve the issue and instead assumed the continued applicability of the substantial burden test. Recent cases suggest that the Second Circuit resolved the split in *Salahuddin v. Goord* by subscribing to the substantial factor test. *Koehl v. Greene*, No. 05-CV-582, 2008 WL 4822520, *7, n.11 (N.D.N.Y. Oct. 31, 2008); *Livingston v. Griffin*, No. 04-CV-607, 2007 WL 1500382, at *15 (N.D.N.Y. May 21, 2007); *King v. Bennett*, No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar. 30, 2007).

particular litigants' interpretations of those creeds." *McEachin v. McGuinnis*, 357 F.3d 197, 201 (2d Cir.2004), *quoting Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989).  Instead, courts may only consider whether a claimant sincerely holds a particular belief and whether the belief is religious in nature."  *Ford*, 352 F.3d at 590.  Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny. *Salahuddin*, 467 F.3d at 474-75.  If such a legitimate penological interest is articulated, its reasonableness is then analyzed under the test articulated by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987).

Pursuant to *Turner*, the court must determine "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective.  *Koehl v. Greene*, No. 05-CV-582, 2008 WL 4822520, *7, n.11 (N.D.N.Y. Oct. 31, 2008), *citing Thornburgh v. Abbott*, 490 U.S. 404, 414 (1989).  Then, the court must ask whether the inmate is afforded adequate alternative means for exercising the right in question.  *Thornburgh,* 490 U.S. at 417.  Finally, the court must examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison."  *Id*. at 418.

Here, there can be no doubt that the governmental objective underlying the regulation is legitimate and neutral.  DOCS' objective in implementing the policy

was to eliminate waste in the preparation of the therapeutic diets, including the renal diet. Built right into the policy is the ability to miss three meals per week. There is simply nothing in the record before this Court to suggest that this policy in any way infringes on plaintiff's First Amendment rights. However, even assuming that plaintiff could articulate an infringement on his First Amendment rights, the DOCS policy described above and discussed at length in *Candelaria v. Cunningham, et. al.* and *Candelaria v. New York State Department of Corrections, et. al*. clearly serves a legitimate penological interest. Accordingly, based on the record before this Court, it is recommended that defendants' motion for summary judgment on plaintiff's First Amendment claim concerning his renal diet be granted.


**Americans with Disabilities Act and Rehabilitation Act of 1973 Claims**

Plaintiff alleges that the acts of all the defendants have violated the Americans with Disabilities Act and the Rehabilitation Act of 1973, stating, without elaboration, that "[t]he acts and omissions of the defendants, each of them, as described heretofore, discriminate against plaintiff on account of his handicaps and physical disabilities...". Dkt. #11, p.55. In support of their motion for summary judgment, defendants argue that plaintiff's claims against the defendants in their individual capacities pursuant to the ADA and the Rehabilitation Act must be dismissed because neither the ADA nor the Rehabilitation Act provides for individual capacity suits against state officials. Dkt. #103, p.29. Moreover, defendants argue that plaintiff's claims must be dismissed because plaintiff has failed to establish that defendants' actions were motivated by discriminatory animus or ill will toward the plaintiff and

plaintiff failed to establish that defendants violated plaintiff's Constitutional rights.  Dkt. #103, pp.30-32.

The Second Circuit has previously held that neither Title II of the Americans with Disabilities Act nor Section 504 of the Rehabilitation Act of 1973 provide for individual capacity suits against state officials.  *Garcia v. SUNY Health Sciences Ctr. Of Brooklyn*, 280 F.3d 98 (2d Cir. 2001).  Thus, based on the foregoing, it is recommended that plaintiff's claims against the defendants in their individual capacities must fail as a matter of law.

In addition, the Second Circuit in Garcia found that the only way a private suit for damages pursuant to Title II of the Americans with Disabilities Act may be maintained against a state is where a plaintiff can establish that an independent constitutional violation was motivated by discriminatory animus or ill will due to disability.  *Garcia*, 280 F.3d at 112.  Here, plaintiff's allegation concerning the American with Disabilities Act and the Rehabilitation Act of 1973 is nothing more than a bare, conclusory allegation that the defendants discriminated against him on the basis of his disability.  *See* Dkt. #11, p.55.  In addition, in opposition to the instant motions for summary judgment, plaintiff suggests, without elaboration, that the discrimination occurred when plaintiff's dialysis schedule was changed.  Dkt. #119, p.10.  Without more, plaintiff's allegations are wholly insufficient to establish a discriminatory animus or ill will on the part of any of the defendants by reason of plaintiff's disability.  As such, plaintiff's allegations are insufficient to defeat the instant motions for summary

judgment. Accordingly, this Court recommends that defendants' motions for summary judgment on plaintiff's Americans with Disabilities Act and Rehabilitation Act of 1973 be granted.


**Retaliation Claims Against Defendants Crippen, Doty and Arnot**

Defendants Kathy Crippen and Timothy Doty are employees of Arnot and both worked in the Dialysis Unit. Dkt. #113-4, pp.1-2. In addition, Nurse Jo Ellen Malinowski, who is not named as a defendant, was an employee of Arnot in the Dialysis Unit. *Id*. As detailed above, beginning in February 2000 and continuing through July 2000, plaintiff made inappropriate remarks to Nurse Malinowski. Dkt. #113-4, p.2. Indeed, on February 5, 2000, March 7, 2000, June 8, 2000 and July 12, 2000, Nurse Malinowski memorialized some of the statements made to her by plaintiff. *Id*.


In his complaint, plaintiff alleges that defendants Crippen, Doty and Arnot knew of plaintiff's complaints of unconstitutional and unprofessional conduct. Dkt. #11, p.11. Moreover, plaintiff alleges that defendants Crippen and Doty knew of defendant Eck's and defendant Baker's retaliatory treatment, *to wit*, the changing of plaintiff's dialysis treatment schedule. *Id*. at p.12. Finally, plaintiff alleges that defendants Crippen and Doty conspired with the other named defendants to coerce Nurse Malinowski to file complaints about plaintiff, to permit defendants Eck and Baker to have access to plaintiff's medical records and to assist defendant Perry in the fabrication of the Inmate Misbehavior Report. *Id*. at pp.13-16.

As discussed above, the Second Circuit has held in *Gayle v. Gonyea* that a plaintiff alleging retaliatory punishment bears a heavy burden to demonstrate that the conduct at issue was constitutionally protected and that the protected conduct was a substantial motivating factor in the decision to discipline plaintiff. *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002). Here, plaintiff alleges that defendants Crippen, Doty and Arnot conspired with defendants Baker, Eck, O'Connor and Perry to coerce Nurse Malinowski into making a complaint against plaintiff for inappropriate remarks. Notably, in his complaint plaintiff only discusses the July 12, 2000 incident and omits any reference to the earlier incidents involving Nurse Malinowski detailed above. Moreover, for the first time in his opposition to the instant motion for summary judgment, plaintiff claims that Nurse Malinowski told him that she had been instructed by defendants O'Connor and Doty to make the entry in plaintiff's medical records or she would be terminated. Dkt. #119, p.3. With the exception of plaintiff's statement that Nurse Malinowski received this instruction from defendants O'Connor and Doty, plaintiff offers no other evidence to support his claims of coercion and retaliation. Specifically, plaintiff does not offer any evidence in admissible form to substantiate this new allegation. In addition to the foregoing, plaintiff specifically alleges that defendant Crippen gave defendants Baker and Eck access to plaintiff's medical records which in turn formed the basis for the false misbehavior report prepared by defendant Perry.

As set forth above, this Court has concluded that with respect to defendants Baker, Eck, O'Connor and Perry, plaintiff cannot sustain his heavy burden

to demonstrate retaliatory motive, and thus, this Court has recommended that defendants' motion for summary judgment on plaintiff's retaliation claims be granted. For the same reasons, the Court concludes that plaintiff's retaliation claims and conspiracy to retaliate claims against defendants Crippen, Doty and Arnot must likewise fail. Accordingly, this Court recommends that the motion for summary judgment filed by defendants Crippen, Doty and Arnot Ogden Medical Center be granted.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of**

**such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

DATED:      Buffalo, New York
            February 9, 2010


                              **s/ H. Kenneth Schroeder, Jr.**
                              **H. KENNETH SCHROEDER, JR.**
                              **United States Magistrate Judge**